29 C.C.P.A.(Patents)

## In re GUNTHER.

### Patent Appeal No. 4577.

Court of Customs and Patent Appeals.

Feb. 24, 1942.

C. P. Goepel, of New York City (Theodore A. Hostetler, of Washington, D. C., of counsel), for appellant.

W. W. Cochran, of Washington, D. C. (Clarence W. Moore, of Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

LENROOT, Associate Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office affirming a decision of the Primary Examiner rejecting claims 10 and 11 of appellant's application for a patent for lack of patentability over the cited prior art. No claims were allowed.

The claims before us read as follows:

"10. In a process for the improved production of pure cellulose, thoroughly saturating corn stalk chaff with caustic soda solution in a closed agitated vessel, introducing dry super-heated steam at 5 atmospheres into the closed agitated vessel to displace the air in the free space of said vessel, introducing a stream of fresh dry superheated steam into the vessel to remove air from fiber pockets of chaff and venting said vessel to permit exit of air and passage of steam, closing said vessel and introducing dry superheated steam at 5 atmospheres into closed vessel to cook and complete disintegration of chaff without further increase in moisture content of the charge.

"11. In a process for the improved production of pure cellulose, the steps of wetting corn stalk chaff with caustic soda solution to saturation point of fibers in a closed agitated vessel, introducing dry superheated steam into said vessel at 5 atmospheres pressure to displace air in free space of said vessel, blowing a fresh stream of dry superheated steam through said vessel for expelling air from the fiber pockets of the chaff and venting said vessel to permit exit of air and passage of steam, closing said vessel and introducing dry superheated steam at 5 atmospheres into said closed agitated vessel and steaming for about 1½ hours to complete digestion of chaff without further increase in moisture content of the mix."

The references cited are:
Russell, 67,455, August 6, 1867;
Valet, 1,630,147, May 24, 1927;

Braun, 1,786,890, December 30, 1930;

Taube, 1,857,985, May 10, 1932;

Manufacture of Pulp and Paper, Vol. III, 3d Ed., 1937, Sec. IV, page 76.

Appellant's application states:

"This invention relates to improvements in the production of pure cellulose. In this field, for example also in the manufacture of semi-cellulose, it is already known to saturate straw and similar grasses with soda lye and to decompose them in rotary boilers with the simultaneous supply of steam.

"In operating with rotary boilers, for example in the production of semi-cellulose from straw and similar grasses, it has also been proposed to displace the air from the fibrous material saturated with a minimum of alkali solution, as well as from the boiler itself, by means of steam, and to apply then fresh steam.

"It is likewise not novel in the art to boil straw and other grasses, using a rotary boiler, in the presence of excess alkali solution, with superheated steam.

"It is an object of this invention to combine the detail measures referred to above so as to establish a one-turn procedure. A further object of my invention resides in simply saturating the straw and like grasses with soda lye without contacting it with excess lye, there being however, at the bottom of a boiler (ball or tumbler boiler) receiving the straw a small quantity of treatment liquor which collects there.

"More particularly, the invention consists in a combined process for producing pure cellulose by the decomposition of straw or similar grasses by soda lye in a rotary boiler, wherein the fibrous material is simply saturated with the decomposing liquid, the air being driven out by steam, and wherein the charge is finally steamed with dry super-heated steam without increasing the content in moisture. At the same time, the air is not only driven out of the fibrous material, but also of the boiler, in order to avoid damaging the cellulose by oxidation."

With respect to the relative proportions of corn stalk chaff and caustic soda solution, the application states: "20 kilograms of chaff cut from corn straw are placed in a tumbler boiler of 200 litres capacity. To this are added about 60 litres of water or waste lye with the addition of 2 kilograms of caustic soda or a corresponding concentration of weak waste lyes, and with the simultaneous addition of 100 grams of sul-

phite or hydrosulphite as a reducing agent. * * *"

The patent to Braun discloses a mixture of 1,000 kilograms of chopped straw with 2,000 litres of a caustic soda solution. This mixture is placed in a boiler and heated gently for about half an hour by direct steam, while the boiler is rotated, for the purpose of thoroughly mixing the charge, whereupon the air and steam evolved is allowed to escape. Thereafter steam is again admitted to the constantly rotating boiler to raise the temperature quickly to 160° C. at a correspondingly high pressure, and this operation is continued for four hours. The steam evolved in the boiler is then allowed to escape and the treated material is separated from what remains of the liquid solution.

The patent to Valet discloses the production of pure cellulose from sugar cane bagasse, using thirty gallons of a solution containing caustic soda for every one hundred pounds of bagasse. This is three-tenths of a gallon of solution for each pound of bagasse, or about two and one-half litres per kilogram. The material is placed in a cooking tank, steam is admitted thereto, and the material is cooked at a pressure of from seven to eight pounds for four to six hours.

The patent to Taube, like that of Braun, teaches the displacement of air from the material being digested. The material is cooked in a solution containing about two per centum of caustic soda.

The patent to Russell relates to the disintegration of vegetable fiber and discloses the use of superheated steam in his process. The patent states: "My invention or process consists in subjecting the fibrous matter to the action of dry or superheated steam, in connection with the action of carbonic acid gas, either separately or combined with atmospheric air, delivered under pressure, and used in combination with chemically prepared solutions."

The publication—Manufacture of Pulp and Paper—discloses the use of superheated steam in the production of sulphite pulp.

It appears that appellant cancelled certain claims (8 and 9) which contained the limitation of "merely saturating the material." These claims had been preliminarily rejected by the examiner, one of the grounds of rejection as stated by him being: "Claims 8 and 9 are rejected as indefinite as to "merely saturating the material". How much is used is not stated,

The specification discloses the use of three times by weight as much liquid as straw and this appears to be more than a mere wetting. In fact, it appears to be more than is customarily employed in the art."

In the remarks of appellant's counsel found in the record cancelling other claims and adding claims 10 and 11 before us, the statement of the examiner above quoted was not challenged, and with respect to claims 10 and 11 it was stated:

"Claim 10 seeks to emphasize the advantage of completely removing the entrapped air from the fiber pockets of the chaff to insure against oxidation of the cellulose.

"Claim 11 is thought to express patentability of the multi-stage process in that boiling is avoided and dry steaming alone is employed to effect the disintegration of the corn stalk chaff to produce pure cellulose."

We would emphasize the fact that the claims before us are not limited to merely saturating the material with the caustic soda solution, as were the cancelled claims 8 and 9.

The statement of the examiner contains the following:

"In the claims it does not appear how much caustic soda solution is used per pound of corn stalk material. Consequently this alleged critical factor can be given little weight. Applicant's specific example mentions the use of 60 liters of water, in which is dissolved caustic soda, with 20 kg. corn straw. Valet, upon whom the claims were rejected, uses 30 gallons of solution for every 100 pounds sugar cane bagasse. This is even less solution per pound of fibrous material than used by applicant.

"The patent to Braun discloses the treatment of straw, stalks, etc., with caustic soda solutions. In a suitable rotary boiler Braun mixes 1000 kg. of chopped straw with 2000 liters of cooking solution. This is less cooking solution per unit of fibrous material than employed by applicant. Braun then steams the material and allows the air to escape. The charge is then cooked under pressure. The only distinction in applicant's process over Braun's disclosure is the use of superheated steam and there is no reason to believe that Braun does not also use superheated steam.

"The idea of removing air from the digesting material has been utilized by others in the art as admitted by applicant.

Taube cooks corn stalks in caustic soda solution and takes elaborate precautions to remove air prior to cooking.

"It is also well known in the art to use dry or superheated steam to avoid undue condensation and dilution of the cooking liquor. Russell conducts his cooking process with dry or superheated steam. It is also to be noted that Russell uses the steam to remove the air in the boiler and from the fibrous material. The book reference states that by using superheated steam there is less condensation and dilution and more rapid heating. The use of superheated steam therefore appears to be a matter of choice within the skill of the art. Furthermore, since the claims are not limited to any specific volume of solution it is not seen wherein the use of dry steam is critical."

The Board of Appeals in its decision stated:

"Appellant argues that the examiner overlooks that applicant does not claim dry steam per se, but only in the specific combination, that is, to act upon the alkali saturated chaff without cooking and it is argued that this is a new function and that a new result has been obtained, that is, the attaining of cellulose without cooking or chemical process, but by the physical action of heat-softening the chaff to enable the alkali to act on the same. It is argued that the expelling of air with superheated steam serves only for the preparation of the chaff and in doing so the material is warmed up so far that later on by introducing the actual opening-up steam, without cooking, no condensate will develop and that, accordingly, the fibers are opened up without surplus of liquid and without the process of cooking. It is further argued that thinning of the soda is avoided since cooking is not present at all.

"It is to be noted that claim 10, for example, calls for closing the vessel and introducing dry superheated steam at 5 atmospheres into closed vessel to cook and complete disintegration of chaff without further increase in moisture content of the charge. According to this claim, therefore, applicant seems to claim the step of cooking. This leaves claim 10, for example, to differentiate from the art chiefly by disintegration of chaff without further increase in moisture content. The so-called book reference suggests that the advantages of using superheated steam are less condensation and dilution and more rapid

heating. With the suggestion in this reference that the use of superheated steam has the tendency to reduce or avoid condensation and dilution, it is not apparent that these claims call for any process which amounts to an improvement over the art cited by the examiner."

It is rather difficult to ascertain from the record and appellant's brief upon what grounds he contends that the claims are patentable.

As hereinbefore indicated, before the examiner, appellant stressed the element of removing the entrapped air by using dry steam and thus avoiding the boiling of the mixture. His chief complaint against the decision of the board is that it confused "cooking" with "boiling."

Appellant also appears to rely upon his conception of merely saturating the material being digested with his caustic soda solution, leaving no excess caustic in the boiler, subject to boiling.

However, the claims before us are not so limited, and the proportion of material treated to the caustic soda solution used does not seem to be materially different from the proportions disclosed in the prior art, and in any event such proportion, whatever it may be, is not a limitation in either of the claims before us.

It would seem therefore that if in the prior art superheated dry steam be substituted for ordinary steam, boiling would be prevented if it is prevented in appellant's process. However, we are not at all certain that appellant's process does avoid boiling. Not only is there no limitation in the claims with respect to a minimum of caustic solution, but his application states that, after saturating the material, a small quantity of the treating liquid is left in the bottom of the boiler. While he states in effect that this residue does not come into contact with the material, it would seem that upon the boiling of this residue liquid at the temperature employed the moist vapor thereof would come into some contact with the material.

However this may be, the claims before us are so broadly drawn that the presence of boiling in the process is not necessarily excluded.

It is to be noted that the patent to Braun shows the use of steam elevated to a temperature of 160° C., while appellant gives the temperature of his superheated steam a range of from 140° to 175° C. Therefore, if the excess liquid in Braun boils, as appellant contends, any excess liquid present in appellant's process would boil.

Therefore it seems to us that the only element of appellant's claims which might involve invention is that which calls for the employment of superheated dry steam, thus avoiding any additional liquid in the boiler caused by the condensation of the steam.

However, the patent to Russell discloses the use of "dry or superheated steam" and the publication reference teaches that the advantages of superheated steam in the manufacture of sulphite pulp are less condensation and dilution and more rapid heating.

Moreover, the examiner stated that it was well known in the art to use dry or superheated steam to avoid undue condensation and dilution of the cooking liquor. This statement was not challenged before the Patent Office. If appellant believed that the cited art did not disclose this, he could, under the rules of the Patent Office, have required an affidavit of the examiner supporting such statement. Having failed to do this, we must accept such statement of the examiner as correct.

In view of all the foregoing, we fail to see wherein any invention has been made by appellant, and the decision appealed from is affirmed.

Affirmed.