## In re CHEVENARD.

### Patent Appeal No. 4804.

Court of Customs and Patent Appeals.

Dec. 8, 1943.

E. F. Wenderoth, of Washington, D. C. (A. Ponack, of Washington, D. C., of counsel), for appellant.

W. W. Cochran, of Washington, D. C. (R. F. Whitehead, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

JACKSON, Associate Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office affirming the final rejection by the Primary Examiner of all of the claims, 8, 10, 12 and 13, of an application for a patent alleging "Improvements in the Manufacture of Compensating Spiral Springs for Watches, Chronometers and the Like." This is a companion appeal to In re Chevenard, Cust. & Pat.App. 139 F.2d 709.

Claims 8 and 10 are illustrative of the subject matter involved, and read as follows:

"8. A process for the manufacture of compensating spiral springs for watches, chronometers and the like, which comprises the steps of taking an austenitic iron-nickel alloy, containing 28–42% of nickel, 0.3–1% of carbon, 4–8% of chromium, 0.5–2% of manganese, 0.2–1% of silicon and additionally a small proportion of at least one of the elements taken from a group consisting of tungsten, molybdenum, vanadium, titanium, aliminium, copper and cobalt for entering into solid solution in the austenite so as to modify its thermoelastic anomaly, and at the same time forming complex carbides which are more soluble hot than cold in the austenite, subjecting it to a gradual wire drawing, with reheatings between the passes, down to a diameter from about 0.4 to about 1 mm, subjecting the wire to a hyperquenching, continuing wire drawing without intermediary reheating, rolling the wire into a ribbon of the desired transverse section, winding the ribbon into a spiral form and finally fixing the latter by heating to temperatures of 550 to 750° C."

"10. A process as set forth in claim 8 in which an alloy is taken comprising 28–42% Ni, 4–8% Cr, 0.5–4% W, 0.5–2% Mn, 0.2–1% Si, 0.3–1% C and at least two of the element Mo, Va, Ti and Al in a total amounting to at least 0.5% and at most 4%, as well as Fe to make up 100."

The reference cited is an article by M. A. Hunter entitled "Alloys of Iron and Nickel with Low Expansion Coefficients", Metals Handbook, 1936 Ed., American Society for Metals, Cleveland, pp. 345 to 349.

The alleged invention relates to a process for making compensating watch springs. The alloy, a type of iron-nickel, is stated to be of the so-called "Elinvar" modification of the "Invar" type. The content of the wire spring and its treatment are so clearly set out in the claims that it is not deemed necessary to describe them further.

While claims 10, 12, and 13 claim the same process as set forth in claim 8, the elements of the alloy appear to be more specific.

The examiner rejected claims 8 and 10 as lacking invention over the Hunter reference and also as failing to properly point out the alleged invention. He rejected claims 12 and 13 on the ground of estoppel in view of appellant's election in response to an Office requirement.

The Board of Appeals affirmed the decision of the examiner, holding that claims 8 and 10 lack invention over the reference, but further holding that the claims properly pointed out the alleged invention. The board affirmed the examiner's decision rejecting claims 12 and 13 on the ground of estoppel in view of applicant's said election.

The reference discloses that Invar is an alloy comprising 36% nickel with minor constituents of manganese, silicon and carbon, and that its coefficient of expansion is so low that its length is practically invariable for ordinary changes in temperature. For this reason the alloy was named Invar.

Elinvar appears to differ from Invar in that it contains a chromium content and in that it possesses the additional property of having the same elasticity "over a considerable range in temperature as well as low thermal expansivity."

The writer of the reference had the following to say concerning Elinvar:

"Elinvar—In determining the thermoelastic coefficients of nickel-iron alloys, Guillaume found that Invar had the highest elastic coefficient of all the alloys in the related group. There were, however, 2 alloys at 29% and 45% Ni which had zero coefficient, that is, their modulus of elasticity did not change with variations in temperature. But since, in these alloys, small variations in the nickel content produced large variations in the elastic coefficient, the commercial application of the discovery was a difficult one. He found that the addition of 12% chromium to an alloy containing 36% nickel produced an alloy which had zero thermoelastic coefficient and one which was not susceptible to small variations in Ni content, which are to be expected in commercial melting. To this alloy he gave the name 'Elinvar.'

"It has a particular application in the construction of such articles as hair springs and balance wheels in clocks and watches and in tuning forks used in radio synchronization, where an invariable modulus of elasticity is required. It has the further advantage in such situations of being non-magnetic and comparatively rustproof.

"The composition of this material has been somewhat modified from the original specifications. Shubrooks gives the following limits for the material as now used.

| | |
|---|---|
| Nickel | 33–35% |
| Iron | 61–53% |
| Chromium | 1– 3% |
| Tungsten | 1– 3% |
| Manganese | 0.5–2% |
| Silicon | 0.5–2% |
| Carbon | 0.5–2%" |

It will be noted that the elements of Elinvar disclosed in the reference are identical with those disclosed in the claims. All of the proportions of the elements shown in the reference are within the range of the elements disclosed in the claims, with the exception of chromium. We are of opinion that in view of the wide difference in amounts of chromium set out in the reference (1 to 12%), the amount of that element in the rejected claims is not critical, and there is nothing in the record from which the amount of chromium claimed could be considered as critical.

Appellant in his brief seems to concede that there is no invention in adopting the particular components of the alloys set out in the claims. He states that

"From the standpoint that the essence of the invention resides primarily in the pro-

cedural steps of manipulating the alloy rather than in the precise composition of the latter, the Examiner's viewpoint may be justified.

\* \* \* \* \* \*

"Coming now to the real essence of the invention, namely, the method of manipulating the alloy, the reference is submitted to be wholly lacking."

With respect to the manipulation of the alloy set out in claims 8 and 10, the examiner held that the drawing of the material with heating between the passes was merely standard hot mill routine followed in the manufacture of steel wire, whether or not it was nickel steel as here. The examiner stated that this step of drawing and heating between the passes was tacitly admitted by appellant as being standard practice.

With respect to the hyperquenching of the material and drawing without reheating, rolling to ribbon, winding to spiral form and heating to temperatures of 550° to 750° C., the examiner considered those steps to be obvious in view of the reference, calling attention to the following passage on page 347 thereof, with his comments thereon in parenthesis at the end of the quotation: "It is possible by cold work following a quenching operation to produce material with a zero coefficient of expansion or even a negative one. In the latter case by careful annealing at a low temperature, the coefficient may be increased to zero again." (The last mentioned step, which is similar in such respect to age hardening or stress relieving anneals commonly practiced after cold working, as is well known in the art of metal working, is a function of time, wherefore a brief heating at 550° to 750° C. would be the equivalent of a longer heating at a lower temperature.)

Appellant in his brief endeavors to distinguish between quenching in water as mentioned in the publication and "hyperquenching" as set out in the claims. There is nothing in this record to indicate that quenching the alloy in water is not as thorough and drastic a quenching as any which the appellant would use with his alloy.

The appellant in his brief states that the examiner cited nothing to support his holding with respect to the brief heating at 550° to 750° C., as the equivalent of a longer heating at a lower temperature, and insists that the examiner's assertions do not coincide with the actual facts. In the absence of anything in the record to contradict the examiner's holding, and in the absence of any demand by appellant for the examiner to produce authority for his statement, we will not consider this contention. In re Gunther, 125 F.2d 1020, 29 C.C. P.A., Patents, 888.

Since we hold that claim 8, the generic claim, is not patentable over the cited prior art, it is necessary that we affirm the decision of the board in rejecting claims 12 and 13 on the ground of estoppel since those claims were for species other than the claim elected to be prosecuted in the absence of a generic claim.

For the reasons herein set forth, the decision of the Board of Appeals is affirmed.

Affirmed.