50 CCPA

**Application of Giorgio G. SOLI.**
**Patent Appeal No. 6999.**

United States Court of Customs and Patent Appeals.

June 6, 1963.

Conder C. Henry, Washington, D. C., for appellant.

Clarence W. Moore, Washington, D. C. (Raymond E. Martin, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Jr., Judges.

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the examiner's rejection of method claim 13, the sole claim in application Ser. No. 587,521, filed May 28, 1956, for "Petroleum and Natural Gas Prospecting."

The basis for and the general nature of appellant's invention is disclosed in the specification as follows:

"The method is based on the fact that, in many instances in oil and gas areas, gaseous hydrocarbons are slowly escaping through the sedimentary formations to the surface. These gases serve as a steady supply of carbon and energy to hydrocarbon-oxidizing bacteria, resulting in the intensive multiplication of these micro-organisms.

\* \* \* \* \* \*

"The present invention is directed to a method of determining the presence and relative amounts of hydrocarbon-oxidizing bacteria in the soil, these bacteria being an indication of the presence of petroleum hydrocarbons. A feature of the invention is utilization of the ability of hydrocarbon-oxidizing bacteria to grow and produce turbidity [i. e., a murky or muddied condition] in a liquid mineral culture medium in which a hydrocarbon gas is dissolved."

Claim 13 reads as follows (the breakdown being ours):

"13. A method of prospecting for subterranean hydrocarbon deposits comprising the steps of

"[1] collecting samples of soil at various depths in certain locations in a prospective area,

"[2] incubating at least one culture of each of said soil samples in a mineral nutrient liquid medium in the presence of an atmosphere of methane,

"[3] simultaneously incubating at least another of said cultures of each of the same soil sample in a mineral nutrient liquid medium in the presence of an atmosphere of propane,

"[4] simultaneously incubating an additional culture of said

same soil sample in a mineral nutrient liquid medium in the presence of atmospheric air,

"[5] determining the amount of hydrocarbon-oxidizing bacteria in said cultures by

"(a) a measurement of the amount of turbidity of said nutrient medium caused by the growth of said bacteria exposed to said methane and propane atmospheres, and

"(b) using said culture incubated in the presence of atmospheric air as a control for said first-mentioned cultures,

"[6] the ratio of soil to culture medium being kept to a minimum."

The Patent Office has rejected this claim as unpatentable over the combined teachings of the following references:

Taggart        2,349,472 May 23, 1944
Strawinski    2,665,237 Jan. 5, 1954
Porter, Bacterial Chemistry and
    Physiology, John Wiley & Sons,
    Inc., 1946, page 95.

Both Taggart and Strawinski disclose methods of prospecting for subterranean hydrocarbon deposits which include collecting samples of soil at various depths in certain locations in a prospective area and thereafter employing various means to analyze the amount of and/or kind of hydrocarbon-oxidizing bacteria in such samples. The pertinence of the Porter reference will be discussed later.

Appellant's several arguments as to why the references of record would not render his invention obvious to one skilled in the art will be considered as they relate to the above-designated sections of his claim.

Section [1]: *Soil Sampling Depth.*

Appellant argues in his brief

"Particular attention is given [in appellant's invention] to the depth of sampling in relation to the amount of organic matter in the soil, since appreciable amount of such organic matter could unfavorably affect the final results. The amount of organic matter decreases with depth; therefore, the deeper the samples within certain limits, the more reliable the results. Decomposition of organic matter in the first layers of soil could give rise to methane gas, which would support methane-oxidizing bacteria, which, in turn, would furnish false positive results as far as the presence of oil and gas at greater depths is concerned. For this reason alone, it is submitted, appellant's claim is patentable over Taggert [sic], who specifies 6 inches of surface soil, and Strawinski, who also specifies surface soil at a slightly greater depth. [Strawinski designates this depth as "below six inches, preferably at depths of 24″ or more."]"

It is clear that the disclosure in appellant's specification does not make soil-sampling depth critical. At one portion thereof it states that soil samples should be taken "at a depth not less than 6 feet." Another portion thereof states, however, merely that soil samples should be collected "at a depth where organic matter is reduced to a minimum." In view of these facts and additionally in view of the fact that we can see no distinction of substance between a depth of soil sampling which may be less than 6 feet and one, as disclosed in Strawinski, which may be two feet "or more" we are not persuaded, by appellant's argument that we should "interpret" the claim in the light of his specification disclosure, that even such an "interpretation" would distinguish the claim from the prior art. All the claim contains by way of limitation is "various depths." It appears to include depths of the prior art.

Sections [2] and [3]: *Simultaneously Incubating in Different Atmospheres Portions of the Same Soil Sample in a Liquid Medium.*

Appellant's specification discusses this aspect of his invention as follows:

" * * * this invention is directed to the simultaneous isolation of bac-

teria able to use methane and to bacteria which attack ethane or propane but which may not be able to use methane. Since we know that neither ethane nor propane are commonly found in soil as a result of decomposition of organic matter, the separate use of methane and propane (or ethane) as test gasses on the same soil sample is an important part of this invention."

To this end appellant places a measured amount of a liquid "culture medium" into five vials.[1] These vials are then "innoculated" with measured amounts of soil. Two of the vials are then filled with methane, two with propane. The contents of the fifth vial will be discussed, infra. The vials are then incubated for two weeks at a temperature of approximately 28° to 30°C.

As to the reason why methane and propane atmospheres should not be mixed, the specification says:

"If growths occurred only in the cultures incubated under an atmosphere of methane, the results for these particular soil samples are held as questionable, for the presence of bacteria able only to oxidize methane, cannot be taken as a positive indication of petroleum hydrocarbons for reasons explained above. If bacterial growth occurred both in methane and propane-exposed cultures, then the results are recorded as positive."[2]

The relationship between the above portions of appellant's disclosure and the relevant portions of the Taggart and Strawinski references can readily be seen from the following analysis thereof made by the board:

"Taggart takes samples of soil from spaced points in the area under investigation, and places each sample in a sealed chamber containing a hydrocarbon gas and oxygen. The samples are allowed to stand for a previously selected period of time. Taggart found that when a sample contains substantial amounts of hydrocarbon-consuming bacteria a pressure drop occurs in the atmosphere above the sample. A manometer attached to the chamber containing the sample is read periodically and the drops in the pressure are recorded. * * *.

"Strawinski is asserted to be an improvement on the Taggart method. Strawinski collects samples from the area under investigation in the same general manner as Taggart. Each sample is thoroughly mixed with a nutrient medium and about 50 ml of the mixture is placed in a reactor vessel. A gas mixture preferably composed of carbon dioxide, oxygen or air and methane at substantially atmospheric pressure is then admitted to the reactor vessel and the latter is connected by a siphon arrangement to a reservoir under atmospheric pressure containing the same nutrient medium that was mixed with the soil sample. The reactor vessel contents are then allowed to

---

[1]. In discussing the culture medium appellant's specification says:

"The composition of the culture medium needs also particular attention, especially in the method described herein as the method itself relies for its diagnostic aims on the presence or absence of bacterial growth. The medium, therefore, should be such as to promote the growth of hydrocarbon-oxidizing bacteria and discourage the growth of other micro-organisms."

Inasmuch, however, as claim 13 does not state the composition of this medium, we will not consider further the particular composition of appellant's liquid culture medium.

[2]. Appellant's reference to "recorded" results is directed to the fact that after the degree of turbidity of the vial cultures is determined and the results labeled as positive or questionable, these results are placed on a map of the area from which the soil samples were taken, next to the particular soil sample to which the results relate. Lines are drawn on this map connecting the points of soil sampling where the soil contains equal amounts of hydrocarbon-oxidizing bacteria as determined by the method of the appealed claim. A similar mapping of test results is disclosed by Strawinski.

undergo incubation at a temperature of 25 to 35°C. After standing for some time it is observed that some of the nutrient medium has passed from the reservoir into the reactor vessel by reason of consumption of gas in the latter vessel by the microorganisms in the soil sample. This transfer of nutrient medium from the reservoir to the reactor is permitted to continue until an arbitrarily selected liquid level is reached in the reactor vessel. The patentee states that a liquid level corresponding to a volume of 100 ml is sufficient to indicate with sufficient accuracy completion of the reaction of the microorganisms on the hydrocarbon. Strawinski therefore measures the time which elapses for the level of liquid in the reactor to reach the 100 ml mark, and this time is an indication of the activity of the microorganisms in the sample."

We also note with respect to Taggart that he discloses—

" * * * that the general principle involved in the present invention can be utilized without following the specific procedure outlined above. * * *. Another refinement is to divide each sample into portions and subject one portion to the action of methane, while another portion is subjected to the action of heavier hydrocarbons under the same conditions, the same concentration of hydrocarbons being used in each case. This procedure serves to eliminate errors which might arise by reason of the fact that the soil may contain bacteria which have a preferential action on methane."

We think it unquestionably clear that Taggart discloses appellant's contemplated *simultaneous* incubation, in *different* hydrocarbon atmospheres, of portions of the same soil sample. We consider unimportant the fact that Taggart does not employ in these incubations a liquid nutrient medium inasmuch as Strawinski clearly discloses that the art had recog-

nized the existence of uncontrollable "variables" which would be encountered in attempting an incubation of hydrocarbon-oxidizing bacteria in the absence of such a medium. In this regard Strawinski states:

" * * * such variables are eliminated by the use of a relatively large amount of [liquid] nutrient which amount compared to any moisture content of the sample and any nutrient content is so large that any variations in moisture or nutrient content are substantially 'ironed out' and each sample virtually standardized."

Sections 4 and 5(b): *Incubating in Atmospheric Air Another Portion of the Same Soil Sample in a Liquid Medium and Using This Incubation as a "Control."*

The contents of appellant's previously noted fifth vial differs from those of his others only in that atmospheric air is used therein rather than a hydrocarbon gas. The reason for this additional vial is disclosed as follows:

"If the soil samples were taken in the described manner, no [bacterial] growth will occur in the culture incubated under atmospheric air, as the hydrocarbon-oxidizing bacteria eventually present will not develop due to the absence of a carbon source. This serves as a control to ascertain that the eventual bacteria growths in the hydrocarbon-exposed cultures are not due to a carbon source other than the hydrocarbon."

The Patent Office position relating to the patentable significance of a control was set forth by the examiner. He said:

"Applicant states that Taggart has no such control like applicant's. There is no issue taken with this view, but when one is attempting to determine the number of bacterial cells that have come to be since a certain time lapse, how can that determination possibly be made without a control? Such a control is stand-

ard procedure throughout the entire field of bacteriology."[3]

The solicitor notes that this statement by the examiner is "unchallenged." Appellant responds by asking whether he must deny all allegations of the examiner before he can appeal.

■ This court has long held that wherever possible, issues should be crystallized *before* appeal to this court. It is neither the function of oral arguments nor briefs before this court to question for the first time the propriety of actions of the examiner or the board to which a response conveniently could have been made before the Patent Office. See In re Chevenard, 139 F.2d 711, 31 CCPA 802. This is not a case where the examiner's allegation appears to be based on mere conjecture. On the contrary, this court takes judicial notice of the use of "controls" in various experimental procedures.[4] Even if we were to assume, arguendo, that the rule of this court were not as stated in the Chevenard case, we noted that appellant's attempt to refute what we think is the justifiable position of the Patent Office relating to the *skill of the art* consists merely of stressing what the Patent Office has admitted—that neither Strawinski nor Taggart discloses, by itself, the use of a control. On the question before us, we think that fact is not significant. It is well within ordinary skill of the art to use a control.

Section 5(a): *Determining the Amount of Hydrocarbon-Oxidizing Bacteria in the Cultures by Measuring the Turbidity of the Nutrient Medium.*

Appellant's disclosure in this regard states:

"The degree of turbidity in each of the four hydrocarbon-incubated cul-tures is * * * measured by means of a colorimeter-spectrophotometer, * * * and the average turbidity from the four cultures [other than that using air as an atmosphere] for each soil sample calculated on the basis of transmission readings."

In discussing the pertinence of the reference disclosures on this point, appellant states: "Admittedly, the measurement of turbidity of a bacterial culture as an index of the number of bacteria present, is an old process. It is disclosed by Porter." He argues, however, that when his method is "viewed in its entirety" it may not properly be said that he has merely substituted Porter's method of estimating the number of bacteria present for either Taggart's or Strawinski's pressure-drop method. We do not agree. Appellant's argument seems to be predicated, at least in part, on the idea that his bacterial measurement is somehow more "direct" than that of either Taggart or Strawinski. We see no distinction, insofar as directness of measurement of bacterial growth is concerned, between the bacterial measurement method used by either Taggart or Strawinski on the one hand and that used by Porter and appellant on the other. Porter actually refers to the *"Opacity Method"* for "the enumeration of bacteria" as being an "indirect" method. Whatever doubt we might have on this point we would resolve against appellant in view of Strawinski's disclosure that a "spectrophotometer," while "not essential" in his process, may be used "to determine the actual amount of hydrocarbon consumed in milliliters." We feel that one skilled in the art, knowing from Strawinski that a photometric measure-

3. The Porter reference, while not cited by the Patent Office for this reason, would seem to support the examiner's position. It states:
    "*Indirect Count.* Several methods have been proposed for the enumeration of bacteria by indirect methods.
    "1. *The Opacity Method.* The opacity of the bacterial suspension to be estimated by this method *is compared with* a control suspension of standard opacity, such as a barium sulfate solution or a bacterial suspension which has been previously counted." [Last emphasis ours.]

4. One need not stir from the TV to discover that "control" groups are used in such everyday occurrences as the testing of the efficacy of toothpaste.

ment had been used for one purpose in the gas and oil prospecting art, if wishing to improve the method of enumerating bacteria in a process utilizing a light-transmitting liquid culture medium, would be expected to turn to other references dealing with photometric measurements, similar to Porter, to see what other possible utilization could be made of such an *indirect* measuring means.

Section 6: *The Ratio of Soil to Culture Medium Being Kept to a Minimum.*

The board in discussing appellant's arguments relating to this section of the claim said:

> "Appellant emphasizes that he keeps the ratio of soil to culture medium at a minimum. We are constrained to agree with the Examiner that this appears to be no more than conventional procedure in bacteriological experiments. Further, it appears to us that Strawinski would have a large excess of culture medium relative to soil."

We have not been persuaded by appellant that this position of the Patent Office "is unsound." As the solicitor would say, the board's allegation with respect to Strawinski is "unchallenged" even on appeal to this court. Furthermore, we see in appellant's specification in this regard merely a statement that a certain ratio of soil to culture medium "is the most satisfactory." No statement is contained therein that would give any basis to appellant's contention that a particular ratio is critical, nor, for that matter, what this ratio may be inasmuch as it is referred to merely as a "minimum."

When, as in the instant case, the Patent Office finds, in the words of 35 U.S.C. § 103, "differences between the subject matter sought to be patented and the prior art," it may not, without some basis in logic or scientific principle, merely allege that such differences are either obvious or of no patentable significance and thereby force an appellant to prove conclusively that it is wrong. Such is not and never has been the rule relating to burden of proof in this court. What

proof an applicant must offer to overcome a position of the Patent Office supporting a rejection can be determined only on the basis of the facts in any particular case. In the instant case, however, the office position relating to the alleged obviousness of the differences which exist between the claimed invention and the prior art seems to us to be founded both on logic and sound scientific principle. We find that appellant failed to rebut this position.

The decision of the board is affirmed.

Affirmed.