**In re Paul Clifford YATES.**

**Appeal No. 81–557.**

United States Court of Customs and Patent Appeals.

Nov. 5, 1981.

Frank C. Hilberg, Jr., Wilmington, Del., and Hoge T. Sutherland, Arlington, Va., for appellant.

Joseph F. Nakamura, Sol., and Henry W. Tarring, II, Associate Sol., Washington, D. C., for Patent and Trademark Office.

Before MARKEY, Chief Judge, and RICH, BALDWIN, MILLER and NIES, Judges.

MILLER, Judge.

This is an appeal from a decision of the Patent and Trademark Office ("PTO") Board of Appeals ("board"), sustaining the examiner's 35 U.S.C. § 103 rejection of claims 1–33 [1] as obvious from Okada et al. ("Okada").[2] We reverse.

## BACKGROUND

### The Invention

Appellant claims a process for oxidizing an olefin to an unsaturated aldehyde. A gaseous mixture of olefin and molecular oxygen is contacted with a catalyst of specified composition at an elevated temperature to convert from 25 to 80% of the olefin to product, maintaining the unsaturated acid content of the product at less than 2% of the unsaturated aldehyde content. Aldehyde is removed from the product stream, and the byproduct gas, containing unreacted starting materials, is recycled through the process after the addition of oxygen and olefin. Claim 1 is representative:

1. The vapor phase selective oxidation process for the preparation of an $\alpha,\beta$-unsaturated aldehyde and less than 2% $\alpha,\beta$-

---

1. In application serial No. 703,285, filed July 7, 1976, entitled "High Yield, Low Byproduct $\alpha,\beta$ -Unsaturated Aldehydes from Olefins."

2. U. S. Patent No. 4,035,418, filed March 3, 1976, and issued July 12, 1977.

unsaturated acids based on the unsaturated aldehyde which comprises contacting a reactant gas containing 1 to 30 volume percent of an olefin of 3 to 5 carbon atoms, from 0 to 40 volume percent of $H_2O$, from 0.25 to 2 times the concentration of olefin but within the range of 2 to 15 volume percent of oxygen and 15 to 97 volume percent of one or more inert gases selected from the group consisting of carbon dioxide, carbon monoxide, nitrogen and hydrogen with a catalyst of the general formula:

$$R_aCO_bFe_cNi_dQ_eM_fY_gZ_hO_x$$

Where $R$ = Bi or Sb

$Q$ = Mo, W, V or mixtures thereof

$M$ = P, Si or Te

$Y$ = alkali or alkaline earth metals

$Z$ = Ag or Tl

and a is 0.6 to 6.0; b is 0 to 3.9; c is 0 to 10.2; d is 0 to 10.2; e is 12; f is 0 to 2.0; g is 0 to 2.0; h is 0 to 0.20 and x is as required to satisfy valence of the other elements with the proviso that

$\geq b$ + c + d must be>6, and

$\Sigma b$ + d must be>5

for a contact time and at a temperature of from 300° to 500°C and pressure of from atmosphere to 10 atmospheres to obtain a gaseous product stream comprising an $\alpha,\beta$-unsaturated aldehyde at a conversion of from 25 to 80%, a mixture of acids and other aldehydes and a byproduct inert gas or moderator comprising mixtures of gases selected from the group consisting of carbon dioxide, carbon monoxide, water hydrogen, nitrogen, unreacted olefin with $C_1$ to $C_4$ saturated hydrocarbon impurity mixture and at least 1% by volume oxygen, separating the byproduct gas from the product stream, recycling said byproduct gas to contact the catalyst together with additional propylene [*sic* "olefin"], oxygen and water to achieve the initial gas composition and separating and recovering the $\alpha,\beta$-unsaturated aldehyde.

*Prior Art*

Okada discloses a process for catalytically oxidizing olefins to unsaturated aldehydes and acids which generally parallels appellant's process, although the catalysts used in Okada's process are slightly different. Appellant argues that his claim limitations, requiring 25–80% conversion of olefin to product with acid production of less than 2%, are not obvious from the reference. Okada does not disclose the ratio of acid to aldehyde produced, but merely states: "[I]sobutylene is catalytically oxidized in the gas phase to yield an oxidized product containing predominantly methacrolein and lesser amounts of methacrylic acid." Okada also contains no disclosure relating degree of conversion to percentage production of acid and exemplifies processes having a degree of conversion greater than 80%.[3]

*The Proceedings Below*

In sustaining the examiner's rejection, the board (one member dissenting) said:

It is wholly expected that the yields of various products, desired and undesired, will change as the operating parameters are altered, and the chemist of ordinary skill is expected to determine the best conditions to achieve the desired result. In the present case, given the fact that the acid results from additional oxidation beyond the aldehyde stage (specification, page 10, second full paragraph, and page 12, lines 25–27), any competent chemist would have expected that high conversion rates would result in increased acid product.

In a separate dissent, Examiner-in-Chief Blech stated:

Contrary to the holding by the majority, I find no basis for their conclusion that "any chemist of ordinary skill would have been aware of the fact that relative yields of aldehyde and acid would be affected by the degree of conversion." On the contrary, this discovery by appellant of the degree of conversion being a result-effective variable which when controlled within the recited range is respon-

---

3. Two of the control examples produce a "total yield of methacrolein and methacrylic acid" of 78 and 79%, respectively. These figures relate to product produced, not olefin converted.

**1056**

sible for obtaining less than 2% of $\alpha,\beta$-unsaturated acid clearly is unexpected and could not have been foreseen.

## OPINION

Appellant places principal reliance upon the claim limitations of 25–80% conversion of olefin and the resultant production of less than 2% unsaturated acid. He argues that the 25–80% limitation would not have been obvious because the low production of unsaturated acid is surprising; that a person of ordinary skill in the art would not have expected the degree of olefin conversion to be result-effective for percentage production of unsaturated acid; that the prior art contains no *express teaching* of this relationship; and that there is no *evidence* of this relationship in the prior art.

The board majority and the Solicitor have taken the position that controlling the degree of conversion to optimize the acid-aldehyde ratio would have been obvious.[4] They do not argue that Okada teaches or suggests this result; indeed, the reference discloses no data regarding the relative production of acid and aldehyde. Rather, it is their position that since the olefin-aldehyde conversion is an oxidation reaction and aldehyde-acid conversion is also an oxidation reaction, any competent chemist would recognize that varying the degree of conversion of olefin to aldehyde would modify the percentage production of acid. Although neither the board majority nor the Solicitor has pointed to objective evidence to support this position, it has the appearance of being "founded on both logic and sound scientific principle." *In re Soli*, 50 C.C.P.A. 1288, 1295, 317 F.2d 941, 947, 137 U.S.P.O. 797, 801 (1963). However, obviousness cannot be established without considering the record as a whole.

To show the unobviousness of controlling the degree of conversion to reduce acid production to under 2%, appellant points to Table 1 in his specification, labelled "SELECTIVITY OF PRIOR ART PROCESSES." The table contains over 80 examples, from ten prior art patents, of olefin to aldehyde oxidation reactions using various oxidation catalysts similar to those used by appellant. Appellant argues that in the prior art there is no evidence of correlation of any kind between conversion and selectivity; correlation only appears when using appellant's catalyst. In these examples, regardless of the degree of conversion, the percentage of acid is generally in the 3–10% range, and no clear relationship between conversion and acid production is apparent. The Solicitor points to six examples in Table 1 which appear to show diminishing acid content with decreasing conversion, but acknowledges that other examples using the same catalysts do not fit this trend and admits that it would be inappropriate to draw firm conclusions from these results.

We conclude that the Table 1 examples, taken as a whole, support appellant's position that degree of conversion was not recognized to be a result-effective variable. *See In re Antonie*, 559 F.2d 618, 620, 195 USPQ 6, 8–9 (CCPA 1977). The Solicitor argues that the results in Table 1 are at least as indicative of the varying selectivities of the catalysts as they are of the relationship between conversion and selectivity and that there is no assurance of record that there were no significant variations in the unreported reaction conditions. This argument is not persuasive. The record does not include the patents from which the examples were taken, and there is no showing of any actual variations in the reaction conditions other than temperature variations. Moreover, the PTO has offered no reason why such variations would change the acid-aldehyde ratio. Also, appellant has not offered these examples as

---

**4.** The Solicitor, relying upon *In re Aller*, 42 C.C.P.A. 824, 220 F.2d 454, 105 U.S.P.O. 233 (1955), argues that it is "not unobvious to discover optimum or workable ranges by routine experimentation." In many instances, this may be true. The problem, however, with such "rules of patentability" (and the ever-lengthening list of exceptions which they engender) is that they tend to becloud the ultimate legal issue—obviousness—and exalt the formal exercise of squeezing new factual situations into preestablished pigeonholes. Additionally, the emphasis upon routine experimentation is contrary to the last sentence of section 103.

comparative tests carefully designed to show the absence of a correlation between conversion and selectivity, but, rather, has presented the examples as data in the art to which a person of ordinary skill would have looked for *evidence* of such a correlation. Although representing a large and apparently typical cross section of the art, the examples show no such correlation. If the PTO considers that the examples are not representative, or that other data show a correlation, or that there is any explicit or implicit teaching or suggestion in any prior art of such a correlation, it must produce supporting references. In the face of appellant's evidence, mere allegations of obviousness are not enough.

Assuming that Table 1 is a fair representation of the prior art, the Solicitor's position that it is inappropriate to draw firm conclusions from the examples is a concession that the correlation between conversion and selectivity would not have been obvious to a person of ordinary skill in the art. In light of appellant's evidence, the argument that a chemist of ordinary skill in the art would have recognized a connection between conversion and selectivity, being unsupported by objective evidence of record, fails to establish a prima facie case of obviousness. The PTO has suggested a reason why it might have been obvious to try varying the degree of conversion to optimize the ratio of aldehyde to acid production, but obvious to try is not the standard of 35 U.S.C. § 103. *In re Goodwin*, 576 F.2d 375, 377, 198 USPQ 1, 3 (CCPA 1978).

Accordingly, we hold that appellant's claimed process requiring 25–80% conversion and less than 2% acid production would not have been obvious.[5]

The decision of the board is *reversed*.

REVERSED.

---

5. Because of this holding, it is not necessary to reach appellant's arguments regarding unexpected results.